606 So.2d 831 (1992)
Mary Skaggs RICHARD, Plaintiff-Appellant,
v.
DOLLAR GENERAL STORE, Defendant-Appellee.
No. 23882-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1992.
Writ Denied November 30, 1992.
*832 Foster and Foster by Mark O. Foster, Minden, for plaintiff-appellant.
Locke Purnell Rain Harrell by Stephen C. Resor, New Orleans, for defendant-appellee.
Before NORRIS, HIGHTOWER and VICTORY, JJ.
VICTORY, Judge.
This appeal involves a slip and fall accident in which a jury awarded plaintiff damages, but found her 25%, at fault. Plaintiff appeals contending the damages were insufficient, and that her percentage of fault is excessive. The defendant answers the appeal, contending the damages awarded are excessive, and that the percentage of fault allocated to plaintiff is insufficient. Finding no error in the jury's verdict, we affirm.

FACTS
On September 11, 1989, Mary Skaggs Richard, a 39-year-old divorced mother of two, met her sister, Royce Harper, at the Dollar General Store (operated by Dolgencorp, Inc.) in Minden. When they arrived, the store had just opened and they were the first customers to enter. Each of them got a shopping cart and proceeded through the store together. As they reached the rear of the store, they separated and plaintiff headed toward the front of the store to get shampoo.
With her shopping cart in front of her, plaintiff turned down the detergent aisle. The cart began to slip away from her, and as she attempted to reach for it, her feet slipped and she lost her balance. The center and lower parts of her back hit a plywood display, and her elbow and ankle were scraped on the plywood as she fell into a puddle on the floor.
When plaintiff cried out for help, Harper and Delandra Thompson, a store clerk, came to the scene of the fall. As Harper arrived, plaintiff was on the floor, crying and complaining of pain. They attempted to help plaintiff up, but she complained of such pain, that Harper, a licensed practical nurse, decided it would be best to leave her on the floor in order to prevent additional trauma.
Thompson and Lois Stegall, the manager, were the only two employees on duty that day. Stegall was helping unload a delivery truck at the front door when Thompson brought her to where plaintiff was lying on the floor.
Stegall searched for the source of the liquid, and noticed, on the top shelf, a 64-oz. bottle of detergent with the lid sitting crooked on top, and a little liquid running down its side and ultimately onto the floor. She then filled out an accident report form, and instructed the clerk to clean up the spill. After telling Stegall that her right ankle and elbow were injured, plaintiff was transported, by ambulance, to the Minden Medical Center, where she was X-rayed and given pain medication before being released. Although the x-rays revealed no fractures or dislocations, plaintiff complained of right elbow, right foot and low back pain.
Two days after the accident, plaintiff saw Dr. Michael Allen, a chiropractor, who diagnosed her as having a sprain or strain to her cervical and lumbar spine and a contusion to her right elbow. Dr. Allen also took an x-ray which revealed a cervical degenerative arthritic condition at C-5 and C-6 levels. He treated her for two weeks and then released her to return to work on September 27, 1989.
On October 5, 1989, plaintiff saw Dr. A.R. Ebrahim, an internist, who hospitalized her for testing from October 9-18, 1989, pursuant to her complaints of headaches, neck and back pain. A CAT scan revealed a bulging disc on the left side at L4-5, but because plaintiff complained of pain in her right leg, Dr. Ebrahim felt the pain was unrelated to the bulge.
While plaintiff was in the hospital, Dr. Ebrahim requested the assistance of Dr. Phillip Osborne and Dr. Warren Long as consulting physicians. Dr. Long, a neurosurgeon, felt plaintiff suffered from a muscle ligament sprain rather than a disc problem. He never tested her cervical region, because she made no complaints of upper *833 back or neck pain. Dr. Osborne, a specialist in occupational medicine, gave plaintiff several tests, but all tests produced invalid results. Based on the invalid tests and the lack of abnormalities in X-rays, Dr. Ebrahim did not assign plaintiff an impairment or disability rating and advised her to return to work on November 22, 1989.
Plaintiff attempted to return to work, but stated she could not because of neck and back pain and returned to Dr. Ebrahim three days later. He discharged her from his care on February 27, 1990, stating that the tenderness would clear up with time.
Plaintiff had been a housewife until she began working for TLC Home Health Care, owned in part by her sister, Royce Harper. She began working there in June 1989, three months prior to the accident, as a nurse's assistant. She took care of one invalid patient, turning him regularly and performing household duties such as mopping, sweeping and the laundry. From March, 1990 until May 3, 1990, plaintiff worked with a lighter schedule, but still could not perform all her previous tasks, such as turning the patient.
Meanwhile in March 1990, plaintiff began seeing Dr. Edwin Simonton, an orthopedic surgeon. His examination revealed pain on the left side of plaintiff's neck and pain in her left shoulder blade. He released her to return to work on April 26, 1990, but she instead sought care from Dr. Felix Prakasam, an anesthesiologist who also specializes in pain management. On June 26, 1990, Dr. Prakasam ordered an MRI which revealed a herniated disc at C6-7, and bulging discs at C3-4, C5-6.
Dr. Prakasam recommended epidural steroid injections in the neck, and an operation to fuse the two vertebrae. He estimated at trial that she would require another six months of treatment, followed by six months of therapy. He assigned plaintiff a 20% disability rating, because in his opinion she could not stand or sit for a prolonged time, and was unable to lift, push or pull over 30-35 pounds.
On September 6, 1990, plaintiff sued the store for her injuries. At the time of trial, July of 1991, plaintiff was still seeing Dr. Prakasam and had seen him for one full year, albeit with a six month lapse, from August 1990 until February 1991, in which she saw no doctor. During the eight weeks before the trial, he performed six epidurals on her lower and upper back and six ligament injections in her neck.
At the conclusion of the trial, the jury returned the following verdict:
(1) plaintiff met her burden of proving there was a foreign substance on the floor which caused a hazardous condition,
(2) plaintiff proved she sustained personal injuries from the fall,
(3) defendant did not meet its burden of proving that it acted in a reasonably prudent manner in keeping the store free from hazardous conditions,
(4) plaintiff was 25% at fault, and
(5) awarded plaintiff $24,039.05 in damages.
The trial judge then reduced this amount to $18,029.29, to reflect plaintiff's proportion of fault. Following a denial of defendant's motion for JNOV, plaintiff appealed, and defendant answered the appeal.

LIABILITY
The initial burden of proof rested on the plaintiff to prove she suffered injury as a result of a hazardous condition on the defendant's premises. Once proven, the burden then shifted to the defendant in accordance with LSA-R.S. 9:2800.6:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous condition which reasonably might give rise to damages.
B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent *834 manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous conditions.
C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included the inspection or cleanup of the area where the accident giving rise to the damages occurred.
In the context of slip and fall cases, a hazard is shown to exist when the fall results from a foreign substance on the floor or from an otherwise unreasonably slippery condition. Stockwell v. Great Atlantic & Pacific Tea Company, 583 So.2d 1186 (La.App. 1st Cir.1991); Kinchen v. J.C. Penney Co. Inc., 426 So.2d 681 (La. App. 1st Cir.1982).
In the instant case, all witnesses testified there was a foreign substance on the floor. The puddle of liquid detergent on the floor clearly was a hazardous condition. The burden then shifted to the defendant to establish that it acted in a reasonably prudent manner in exercising the duty of care it owed to keep the premises free of any hazardous conditions.
Stegall testified she arrived at the store at 7:50 a.m., counted the money and put it in the register, then swept and mopped the floor. She finished mopping at 8:30 a.m., and noticed no debris. Further, Stegall testified she had walked past this area on several occasions that morning and noticed nothing in the floor prior to the fall.
Thompson arrived just before 9:00 a.m., and did not check the aisles prior to opening. She was unaware of inspections or mopping on a regular basis, and knew of no store policy for cleanup procedures, although the employees would clean up things they noticed on the floor. She did not remember the manager ever checking the floors on a regular basis, and testified she would have remembered it if it had occurred.
The jury found the defendant did not meet its burden of proving that it acted in a reasonably prudent manner in keeping the store free from hazardous conditions. We cannot say the jury was clearly wrong in this finding, since it is supported by the testimony of Thompson. Rosell v. ESCO, 549 So.2d 840 (La.1989); Tannehill v. Brookshire Grocery Co., 588 So.2d 1282 (La.App. 2d Cir.1991), writ denied 592 So.2d 1334 (La.1992).

ALLOCATION OF FAULT
Plaintiff urges that her 25% allocation of fault is excessive, while defendant seeks an increase in plaintiff's percentage of fault.
If a person suffers injury partly as a result of his own negligence and partly as a result of the fault of another person, the amount of damages shall be reduced in proportion to the percentage of negligence attributable to the person suffering the injury. LSA-C.C. Art. 2323.
In Lloyd v. TG & Y Stores Co., 556 So.2d 629 (La.App. 2d Cir.1990), this court held that a plaintiff was 50% at fault when, as headed toward a blue light special, she slipped in a yellowish puddle of Spic and Span, the size of a large pizza. Plaintiff did not see the puddle, yet the court held that a spill of this size and color should have been seen by a reasonable person maintaining a proper lookout.
In the instant case, there is conflicting testimony concerning the liquid on the floor. Plaintiff testified that she never saw anything in the floor until she was sitting in it. Stegall testified the puddle measured about two inches wide by six inches long, where the cart's wheels had passed through it. However, Harper, plaintiff's sister, described the puddle as clear with a yellowish tint to it, and stated that the spill was about two feet in diameter.
We find there was sufficient evidence for the jury to assess a percentage of fault to the plaintiff. The spill in Lloyd, *835 where the plaintiff was 50% at fault, was about the size and color as the spill in the instant case, as described by plaintiff's sister. Allocation of fault is a factual finding which an appellate court does not disturb unless, upon articulated and detailed analysis or reasons, that finding is demonstrated to be clearly wrong. Nichols v. Stone Container Corporation, 552 So.2d 688 (La. App. 2d Cir.1989), writ denied 556 So.2d 1262 (La.1990). We cannot say the jury was manifestly erroneous in assessing plaintiff 25% fault or in failing to assess her with a larger degree of fault.

DAMAGES
While appellant states in brief that plaintiff's medical expenses were $24,038.05, he argued in closing argument to the jury that plaintiff had incurred $24,034.05 as past medical expenses. In fact, the actual medical bills introduced at trial and subsequently viewed by the jury during deliberations do not reflect either amount, but instead appear to total $27,967.75. The jury was given only a single line on the verdict form on which to award an amount of damages. The interrogatory read as follows:
No. 6: What amount, expressed in dollars, will adequately compensate the plaintiff, Mary Skaggs Richard, for her damages and injuries you feel were proximately caused by this September 11, 1989 slip and fall accident?
In that blank, the jury placed the amount of $24,039.05.
Since this amount was so close to the amount of medical expenses argued to the jury, plaintiff claims the jury erred in failing to grant an adequate award for general damages. On the other hand, the award can reasonably be construed as including only those past medicals proven to have been necessitated by the fall, a sum for other items of special damages argued to the jury, and a sum for general damages.
In tort cases, much discretion is left to the jury in assessing damages. LSA-C.C. Art. 2324.1. The determination of whether a trier of fact abused its discretion in assessing damages must be based upon the peculiar facts of each case and with due regard for the fact that the jury is in the best position to evaluate the credibility of witnesses, including their testimony about the nature and extent of their injuries. Marshall v. A & P Food Co. of Tallulah, 587 So.2d 103 (La.App. 2d Cir.1991).
On appeal, plaintiff cites Bienvenu v. State Farm Mutual Automobile Ins. Co., 545 So.2d 581 (La.App. 5th Cir.1989), Evans v. Newton, 459 So.2d 586 (La.App. 5th Cir.1984), Odendahl v. Wild, 418 So.2d 36 (La.App. 4th Cir.1982), and Ammons v. St. Paul Fire & Marine Ins. Co., 525 So.2d 60 (La.App. 3d Cir.1988), writ denied 525 So.2d 1045 (La.1988) for the rule of law that a jury cannot award the special damages incurred in an accident and refuse to award any amount for general damages. However, each of these cases involved itemized special verdicts which revealed that the jury refused to award general damages when the evidence clearly showed the plaintiff was entitled to some amount of pain and suffering. This reasoning is inapplicable to the present case, which involves a single-line general verdict.
When the trier of fact itemizes damages for medical expenses and omits damages for personal injury, pain and suffering, the error of law is apparent. Roy v. Schneider, 367 So.2d 1314 (La.App. 4th Cir.1979); Robinson v. General Motors Corp., 328 So.2d 751 (La.App. 4th Cir.1976). In the present case, had the jury itemized its verdict and awarded the exact amount of past medical expenses and nothing for pain and suffering, there would be an obvious error of law to be corrected by this court. See Robinson v. General Motors Corp., supra, in which the jury awarded "none" for pain and suffering, yet awarded the exact amount of medical expenses.
However, as stated by the court in Hood v. State Farm Mut. Auto. Ins. Co., 376 So.2d 328 (La.App. 4th Cir.1979), when there is an unitemized general verdict in a tort case involving several claims for special and general damages, an appealing party has difficulty in demonstrating the jury's intention to award a specific amount for any particular item. In such cases each *836 appeal must be decided according to its particular facts and circumstances. See also, Roy v. Schneider, supra.
In Hood, Judge Lemmon, speaking for the court, said that a jury's award of the exact amount of medical expenses in a general verdict did not constitute an abuse of discretion, relying on evidence and argument of exaggeration and overtreatment of the plaintiff's injuries. The Hood court distinguished an earlier general verdict case, Roy v. Schneider, supra, which held that the jury failed to grant any general damages, since objective symptoms of injury were established and there was no suggestion of overtreatment.
A review of the record in this case shows that from his opening statement through his closing argument defense counsel claimed that plaintiff was not seriously injured in the fall, that many of her medical bills were not necessitated by her fall, that she was doctor shopping, and that her treatments by Dr. Prakasam were improper, unnecessary, and unrelated to the accident.
In the judge's charge to the jury, he explained to the jurors that damages must be established by a preponderance of the evidence and that they were not entitled to award speculative damages for injuries which they thought the plaintiff might have suffered, or might suffer in the future. In light of these instructions, we must assume the jury awarded plaintiff an amount which it considered would adequately compensate plaintiff for all the damages and injuries it believed were caused by the accident.
Following the accident, plaintiff's primary complaint was with her low and mid-back. She saw Dr. Ebrahim, an internist, who on October 9, 1989 ordered a CT scan of her lower back, which showed a bulging disc on the left side of L4-5. Because plaintiff's pain was radiating down her right leg, Dr. Ebrahim found the pain not related to the bulge. Since her complaints of neck pain were localized in the center of her back and did not radiate to her arms, Dr. Ebrahim did not find it necessary to test further for cervical problems. In a video deposition, Dr. Ebrahim stated that at no time during his treatment of plaintiff did he believe that she was suffering from a herniated cervical disc.
During his treatment, Dr. Ebrahim consulted Dr. Osborne, who later wrote a report which stated: "I cannot find any evidence where the patient actually hurt herself in this fall." At trial, Dr. Osborne stated he would not accept that plaintiff had a ruptured disc in the neck at the time he saw her in October of 1989.
Plaintiff then saw Dr. Edwin Simonton, Jr., an orthopedic surgeon, from April 2, 1990 to April 26, 1990, complaining of back and neck pain. Based on his examination and the patient's history, Dr. Simonton felt she had a degenerative joint disease, which was aggravated by trauma. He administered an ultrasonic treatment, advised her to return as needed, and told her she could continue working, as she had been doing.
Plaintiff next sought treatment from Dr. Felix Prakasam, an anesthesiologist, on April 25, 1990, complaining of pain in her neck and upper back, with radiation of pain to both shoulders and sides of her head. Over nine months after the accident, on June 26, 1990, Dr. Prakasam ordered an MRI which revealed a herniated disc at C6-7, and bulging discs at C3-4, C4-5. He treated plaintiff with numerous injections of cortisone and local anesthetic in the epidural space of the lower back and numerous ligament injections in the neck. Dr. Prakasam's bill for one year of this form of treatment and physical therapy was over $15,000.00.
At his deposition, Dr. Simonton reviewed the MRI taken by Dr. Prakasam, and stated that the herniated cervical disc on plaintiff's right side was not consistent with her pain radiation on the left side. He stated his concern that plaintiff's symptoms were not causally related to the fall in defendant's store.
Every physician who treated plaintiff prior to Dr. Prakasam could not find any objective findings to substantiate her complaints, despite extensive testing. For this reason, the jury could have reasonably concluded that many of plaintiff's medical *837 bills, especially those of Dr. Prakasam, were not necessitated by her fall.
After carefully considering the history of plaintiff's complaints, treatments, and diagnoses, we find the jury could have reasonably believed the testimony of Drs. Ebrahim, Osborne, Long, and Simonton, who opined plaintiff was not disabled from the fall, nor in need of future treatments. The jury could have reasonably concluded plaintiff suffered only moderate injuries from the fall, which were substantially resolved before she went to Dr. Prakasam. Defendant's attorney strenuously argued during the trial that the jury should disregard Dr. Prakasam's expensive unconventional treatments and his speculative estimation of plaintiff's future medical expenses. Based on the medical testimony as a whole, the jury could have rejected Dr. Prakasam's testimony and treatments and relied on the testimony from plaintiff's initial treating physicians that she did not suffer a disc injury as a result of the accident.
Further, the jury could have reasonably determined that plaintiff was not disabled from working. The evidence reveals she was discharged to return to work by her initial treating chiropractor less than three weeks after the accident, but chose to consult another doctor instead. Subsequently, Dr. Ebrahim discharged plaintiff to return to work in November of 1989 and again in February of 1990. The orthopedic surgeon who was next selected by plaintiff, Dr. Simonton, also did not assign any disability, especially since plaintiff was working while he treated her during the month of April, 1990.
For the 16 years prior to trial, plaintiff's only income from her labor was $2,463.60 in 1989, and $1,489.51 in 1990 from TLC, where she earned $4.50 per hour. Plaintiff's economist testified under cross-examination that his projected earnings for plaintiff were all based on the assumption that plaintiff was disabled from working. Based on the competent medical evidence which assigned no disability, it was well within the jury's discretion to refuse to award plaintiff any future lost wages.
Further, considering the testimony of Drs. Allen, Ebrahim, and Simonton, who all discharged plaintiff to return to work following a short treatment period, the jury could have reasonably concluded that plaintiff was able to return to work long before she saw Dr. Prakasam and was entitled to only a portion of the claimed past lost wages.
As in Hood, we cannot say with any degree of certainty what particular damages the jury believed the plaintiff proved by a preponderance of the evidence. There were serious disputes at trial concerning exaggeration and overtreatment. Although it can be argued that the jury intended to make a general damage award of only a few dollars more than the amount of past medical expenses argued to the jury, we believe that is unlikely. It makes no sense that the jury would accept plaintiff's testimony and evidence of a serious disc injury by awarding substantially all the past medical expenses of over $24,000, yet only award $5 as a result of the same evidence tending to show substantial pain, suffering, disability, future medical expenses estimated to be up to $30,000, and past and future lost wages. It is much more reasonable to conclude that the award includes all damages the jury determined were caused by the accident, such as general damages, some past lost wages, and some past medical expenses.
As in Hood, we believe the jury's award, under the circumstances of claimed exaggeration, overtreatment, improper treatment, and lack of causal connection, constitutes an exercise of their discretion, rather than a refusal to award sufficient general damages. Depending on what evidence and testimony the jury found to be credible, the jury could have reasonably awarded plaintiff substantially less or substantially more than the amount awarded here.
In conclusion, we find the jury did not abuse its discretion by awarding plaintiff $24,039.05 for the damages it determined were caused by the fall in defendant's store.

*838 DECREE
We affirm the jury's verdict on the issues liability, allocation of fault, and damages. All costs are assessed to appellant.
AFFIRMED.